I represent three of the plaintiffs, plaintiffs in the Havasupai tribe v. Forest Service case, there are three consolidated cases. I'll be sharing my time with counsel in the other two cases. Do you want to tell us what time division you have in mind? We're going to try to split as evenly as possible, Your Honor. Three into twenty-five goes eight and a third minutes? That's right. And I'm going to focus my remarks on the Religious Freedom Restoration Act. Before the Forest Service understood that the Religious Freedom Restoration Act might apply here, in the environmental impact statement, final, F-E-I-S, they stated the following, there would be much greater disruption to the spiritual and cultural values of the tribe than currently exists and the impacts would be longer lasting if this project goes through. They went on to say, at least a portion of these impacts must be considered as a potentially irreversible impact to these tribes' religious and cultural foundations. In addition, the use of reclaimed water is believed by the tribes to be impure and would have an irretrievable impact on the use of the soil, plants and animals for medicinal and ceremonial purposes throughout the entire peaks as the whole mountain is regarded as a single living entity. Your Honor, the Forest Service was correct when it said that, and I can give you some specific examples that relate to some of our clients. Norris Nez, one of our clients, is a Navajo medicine man. Testimony is that the peaks are a unitary whole, a living entity, where ceremonies are performed that are critical to his religion, one such ceremony being the Blessing Way Ceremony. In order to do that ceremony, Mr. Nez must make pilgrimages to six sacred mountains, must gather materials from those mountains which he forms into a medicine bundle. Without materials from all those mountains, the medicine bundle cannot be formed. That bundle is a conduit for prayer. Can you help us understand how the proposed project is different from the existing use at the ski area and how that difference impacts on your client's religious practices? I think the key difference is the use of the treated sewage effluent for snowmaking. Putting that onto the mountain contaminates the whole mountain from a spiritual perspective, in the case of Mr. Nez. Is there a showing that Mr. Nez will be unable to gather pure water, or is it rather a concept of purity? What the concept is, is that by putting the impure water onto the mountain, the entire mountain, which is a living entity, is contaminated. It's like a desecration, in other words. Yes. In other words, there was one witness who was called on Mr. Nez's behalf, who made this analogy. He said the current development up there is like having sores on the body that turn into scars. You can live with that. But the placing of the treated sewage effluent on the mountain is like putting a contaminated needle into your body with poison. So the impact is just far greater from the use of the recycled wastewater on that mountain than is the case in terms of current development. Is there any evidence that the recycled wastewater will contaminate the source, the water that's there? What's the evidence? Well, I'd like to give you a two-part answer on that. I think the first part is that from a spiritual perspective, this water cannot be reclaimed. Once it is contaminated with waste from mortuaries, from hospitals, it simply cannot be reclaimed. But in terms of the actual health effects of that water, I would like to defer that to another of the council, who I think is prepared to address that part of it in more detail. Okay. Would I be correct if I understood that what you're talking about now is a psychological impact, that if they didn't know this was reclaimed water, there would be no problem? What we're talking about is spiritual impact. I mean, why is a glass of wine and a Catholic service important? Because it's the blood of Christ. By the same token, for instance, in the case of the wallopi, putting this water on the mountain is like putting death onto life. That's a spiritual taboo. Any religion has certain spiritual beliefs, and I think that you have to credit those beliefs. That's what a religious claim is all about. So I wouldn't say it's psychological. It is the spiritual impact of that. Now, to be sure, this water is not as pure and pristine as defendants are going to make it out to be, and I think another of my council will address that in his remarks. But you have to look at the spiritual impact of using that water on the mountain. It's an absolute taboo spiritually. But for Mr. Nez, for the wallopi, for the hope, for Mr. Preston, another one of our clients, and that's who I need to speak to. You addressed the legal standard. What standard are we supposed to apply here under RFRA? How much of the Gold Road case or the Ling case survives RFRA? Does RFRA tell us a slightly different test and we ignore Ling? I mean, could you help us out on that? I think that's the centerpiece of the case, Your Honor. RFRA reinstates the compelling interest test from Sherbert v. Verner in Wisconsin v. Yoder. That test was not applied in Ling. If you look at the Smith case, the Smith specifically, Smith case, which RFRA overturned, Smith specifically says that Ling did not apply Sherbert analysis. It says, in fact, the basis for our decision here is that there are a number of cases that didn't apply to Sherbert analysis. It cites four cases, and Ling is one of those cases. And if you're right that we now simply look to RFRA, the test is what? Just give us the one, two, three. I know in San Jose Christian College, Judge Rawlinson provided the test in the RLUPA context, which is an activity that places a great onus or restriction upon religious activity. What's the code word in terms of how severe the restriction must be? Great onus or restriction is the terminology. I have to tell you that I've been on two of those panels now, and I have to tell you that RLUPA is a little different than RFRA, so I'm not necessarily sure that that translates into a scenario in the RLUPA context. The portion of that statute we were dealing with dealt with land use planning, and the use of an individual's own private property, which is a little different than RFRA in the context of the government using its own property. So I'm not sure that I'm persuaded that my definition in San Jose translates to this scenario. Except that the history is clear that the RLUPA standard was modeled on RFRA, and that there was really no different standard when it comes to the substantial burden test. So we're talking about substantial burden. If there is a substantial burden, then the government must come forward with a compelling state interest. Correct. And you're arguing that putting impure water on the mountain for your clients is a substantial burden. That ceremonies are directly affected. There's uncontradicted testimony which the judge accepted the sincerity of, that certain ceremonies will no longer be able to be conducted if this water is placed on the mountain. And I would make the point, Your Honor, that the whole LING standard, the coercion penalty standard, doesn't fit with any of the legislative history under RFRA in the sense of the types of cases they were trying to deal with. They were talking about autopsies and land use and historic preservation. That test, you'd never win under that test in those circumstances. And I'd also note, I know that they're going to cite legislative history from the Senate side that LING survives RFRA, and I would note to you, and it's in our brief, there is legislative history on the House side that suggests the RFRA test is inapplicable. So it's a mixed history. The statute is very clear. And I would suggest that you should implement the statute that reinstates the compelling interest test and not look at LING. If for any reason, and I see my time is already up. And out of respect to my co-counsel, I will conclude that simply that I think applying this, interpreting this statute to allow Native American practitioners of ancient land-based religions is the right thing to do. If convicted felons in San Quentin can make the government go through its paces, these practitioners ought to have that same right. Thank you. Thank you. May it please the Court, my name is Scott Canty, and I represent the Hopi tribe. I will be talking directly to Hopi issues this morning. The central issue here is whether or not RFRA, the protections afforded by RFRA, are broad enough to encompass Indian people who are practicing their religion on their ancestral homelands that have now become part of the public domain. And we maintain that RFRA is, in fact, if you read the statute, the plain language of the statute, it is, in fact, broad enough. This case is extremely fact-bound. There are many, many facts that the Court has found and that were testified to, and I'd like to refer to some of those facts concerning what is the burden on the Hopi practice of religion here. The Hopi, as reported in the opinion, have revered this place, this mountain, for more than a thousand years. The Hopi have, in fact, built their entire culture around the Kachina religion, and that Kachina religion takes as its central tenet that the mountain is a living entity, that it is inhabited by deities called Kachina. Those Kachina come to the Hopi villages on an annual basis beginning every December, and they stay there, they dwell there, they teach the people, and they bring blessings to the villages until they return to the mountain in July at the end of the ceremonial cycle. The cycle is repeated every year, as it has been for more than a thousand years. The Kachina come and they teach these Hopi children how to live. They teach them how they should view themselves, their parents, their community, what their responsibilities are in this community, and they, in essence, teach them how to make their culture survive, and this is how it has survived. The Kachina bring two things. They bring life-giving rain, which nourishes the crops that the Hopi depend on to feed their families, so it takes care of the temporal needs of these people first off. Secondly, it brings spiritual sustenance to these people in teaching them how to be human beings, how to respect one another, how to live in a community that depends on nature to provide for everything they need, and all of this goes back to this mountain and the way that these people look at this mountain. The court found that, and I'm referring to the decision now. The court found that there are more than 40 kiva. These are like churches on the Hopi Reservation. These are kivas where people gather and they talk and they teach and they learn what these Kachinas have to say to them, and that each one of these kivas sends representatives to the mountain to invite the Kachina, to offer prayers, to do the ceremonies that occur there, but that's not the end of it. What happens is those ceremonies then move back to the villages. The Kachinas come to the villages, and the religion takes place not only on the mountain but there as well. This use of, and I should make it clear here, that what the Hopis are concerned with is not just snowmaking with effluent. We're concerned about both snowmaking itself, which usurps the authority of the Kachina, but we're also concerned with using effluent in this way. We believe it is an extreme desecration of the mountain and that it will undercut ... that your clients object to snowmaking, and they object to snowmaking particularly if it's snowmaking with treated effluent. That just adds insult to injury, Your Honor, using the effluent. The Hopi object to snowmaking per se. The Hopi believe that that is the responsibility of the gods, the deities that live on that mountain, and that to usurp their authority is an affront and an insult. Does the use of effluent to make snowmaking, does it make it worse? It makes it much worse because it not only ... What it does is it desecrates the entire mountain, which the Hopi believe is a living entity. This is a place where their ancestors, when the Hopis die, this is where they go. They become Kachinas. They become the blessing for their children who are left behind, and they return to the villages to do these things for them, to bring them these blessings. It's easy to see under those circumstances why this is a substantial burden on Hopi religion because when they look at this mountain and they see this icon, this central figure in all of Hopi religion being desecrated in this way, how can that not help but impact how they see themselves, how they see the Kachina, how they see their ceremonies that are going on in the villages? One of the witnesses that testified at trial emphasized that this was something that would undercut their faith. How can you teach a child that this is a sacred place, that these deities are sacred beings, if in fact that mountain is subjected to this sort of treatment? If four months out of the year treated sewage effluent is put onto that mountain? Yes. It becomes no longer a sacred place. It just becomes a place, just another place. If there was no snowmaking without using treated water, would there be the same desecration in your mind? Yes. The Hopi object to that, Your Honor, because of the belief in their faith that it is the responsibility of the Kachina in that mountain who live there to bring the snow and the rain and the moisture that nourishes their crops. Would that rise to the level of desecration as well? It would. Now, let me make sure you understood precisely Judge Rawlinson's question. She said, is it the same desecration? And you said yes. You previously answered my question when I said, is it worse? And you said yes. I guess there are matters of degree. Which is it? Is it the same desecration? If you use treated effluent compared to pure water, or is it worse? It's desecration, but the effluent is worse, I guess. Let me try to get a perspective here so I'll understand what you're saying better. How would your clients look at campers who go there? And I'm assuming that's okay. But they're careless. And every other year they start a big forest fire. How would that be viewed? How would the forest fire as a consequence of careless campers be viewed? The Hopi have not... I guess more specifically, is it a desecration in the same sense that we're talking about? No, Your Honor. The Hopi have not objected to those sorts of uses, camping, hiking, all of those other kinds of uses that do occur in the forest and do occur on the peaks. The Hopi have not objected to it. The specific objection has always been to this ski resort, and now to snowmaking and snowmaking using effluent. So the Hopi have not objected to all uses, and we continue to believe that multiple use can continue in that forest without this particular use. That's been our position. The essential item, and I think I'm out of time, so I'm going to have to sit down, Your Honor, but I'll turn it over to Mr. Shankar. What I think we should do is we'll hear from Mr. Shankar, and then you'll be, in a sense, out of time, but we'll make sure to give each of you a minute or so for rebuttal. Good morning. My name is Howard Shankar. I represent the Navajo Nation, the White Mountain Apache Tribe, the Yavapai Apache Tribe, the Havasupai Tribe, the Sierra Club, the Center for Biological Diversity, and others. Before I get started, and I didn't want to go into an introduction because it would take all my time, but I would like to let the Court know that Joe Shirley, Jr., the President of the Navajo Nation, is here with us today, as well as Mr. Morgan, the Speaker of the Navajo National Council. First, I'd like to... And Miss Navajo Nation. Excuse me, Your Honor? I said, and Miss Navajo Nation is here as well. Thank you. There are two things, well, a few things first, just based on some of your questions I'd like to point out. While RLUIPA is different from RFRA, the definition of substantial burden on religion is the same. RLUIPA amends RFRA and actually changes the religion. And just briefly, the way it was used in San Jose Christian College makes perfect sense because you're taking the definition that's applicable in this case and you're looking at the common sense, common usage of the terms. So even though RLUIPA and RFRA may be different, the way the definition is applied should be the same. That should be applied in this case. Second, you asked about what's going to be different with this proposal. Here's what's different. What they're proposing to do now is put reclaimed wastewater, reclaimed sewer water, they're going to run a pipe from the Flagstaff City Wastewater Treatment Plant, and it's treated,  and they're going to spray the reclaimed sewer water on about 205 acres on the mountain. Were you going to address the NEPA issues? Yes. If I have time, I will. I think we have a pretty clear feel for what the RFRA issues are, but I'm a little more interested in what your NEPA. Okay. I'll get to that immediately. I guess there was one other question that was raised about the camping and the hiking. All of the tribes and all of the other members here that are represented, the relief we're seeking essentially maintains the status quo. So there would still be skiing, there would still be hiking, there would still be whatever's going on right now. What we're trying to stop is the desecration, which comes from the clearing and grading that's proposed, I think between 80 and 100 acres, and the snowmaking. The dilemma we have is that this is, you know, the government does have, this is government land also, and it has some right to administer, you know, the forest. And so that's what we're looking at, the balance between the RFRA rights and the government's undisputed right to manage public land. So how do you address that? Well, first of all, the government action is guided by RFRA. Second of all, the forest manager, Nora Rajour, testified on the stand that even if we won this case, they'd still be able to manage that section of the mountain the exact same way they're managing it now. This has no impact on government land management. There can still be skiing, there can still be recreation. Time is running, and we've discussed only RFRA. There is a substantial issue under NEPA in this case. Well, we've raised three NEPA issues. The first is that the Forest Service failed to discuss and disclose the report of Dr. Paul Torrance. Second would be that they didn't adequately discuss the 1.5 million gallon recharge issue. And the third is the fact that they didn't discuss the fact that children are going to be eating the snow made from reclaimed wastewater. Why don't you start with that last one? The last one. Okay, Your Honor. It's not discussed in the environmental impact statement. It shows up in one place in the response to comments. What the Forest Service says is we're going to post signs that say this is snow that's made from non-potable water, and it's the responsibility of the guardian or the parent to make sure that their kids don't eat the snow. That's not the kind of probing and in-depth analysis that's required under NEPA. Is there some issue not merely as to children but as to skiers? Well, there's a general – I'm not sure I understand. Are you a skier? No, Your Honor. Do you know the term face plant? Yes, Your Honor. So I ask, is there some issue as to skiers ingesting snow? Absolutely, Your Honor. Okay. And, in fact, what the lower court and the defendants cite to is some general discussion of health impacts in the EIS. The fact is the EIS says in it that those impacts are inconclusive and they're not even sure what's in this water completely. But the fact is they never discuss children, and the reason children is important is because they're a separate subset of the population and they're more sensitive to these types of exposures and exposure to toxins, and they will eat snow intentionally, including my daughter. It's just not in the environmental impact statement. Under NEPA, that's an impact that should have been discussed and it wasn't. Is there anything in the environmental impact statement that tells us whether someone reading a sign that says reclaimed water understands what reclaimed water is? Not that I'm aware of, Your Honor. I'm not sure. But I do know that my six-year-old skis, and I don't think he would understand what the sign says. But it says it's up to the guardians to keep the children from ingesting the snow. How does that change your response? There's no analysis in the environmental impact statement on the impact that eating the snow would have on children. But isn't the analysis that you should tell your six-year-old I'm taking you skiing, it's very, very bad to eat the snow, don't do it, why isn't that responsive? It doesn't meet the requirements of NEPA. They've got to consider the impact that this project could have. Posting a warning does not come to that standard of analysis and discussion that's required. So what should they have done? And this is actually a very simple question because it's without observance of the procedure required by law. It doesn't even bring you into this aspect of arbitrary and capricious. They simply didn't do it. What they should have done is they should have said the potential impacts we're concerned about if children eat snow are X, Y, Z. We've done studies or we haven't done studies that show this. And that would have met their burden. That would have complied with the requirements of NEPA, but it didn't. As I understand the FEIS, the only place at which children eating snow is discussed and where the response is, well, there are going to be signs and it's the responsibility of the parents, is in response to a comment. It's not in the body of the study at all. Well, that's right, Your Honor. But we did have some argument in the lower court that the EIS is two volumes. The first volume is the actual EIS. What they call the EIS volume two is actually the appendix, but some of my other discussions reference that as not part of the EIS either. Well, I think it's part of the EIS in a sense, but it's simply not. Unless anyone should mistake this for a study of what happens to children, it's a one-paragraph answer to a question. That's exactly right, Your Honor. And then, frankly, with regard to the report of Dr. Paul Torrance, if I could move on, that that's also only addressed in the response to comments. And I would draw your attention to Center for Biological Diversity versus the Forest Service 349F3rd 1157, which is also relied on by the lower court, and it talks about this disclosure and discussion requirement. In our reply brief, we list the elements that Dr. Torrance raised that were never discussed or disclosed in the EIS. And, again, his report was only briefly addressed in the response to comments. Again, that's without observance of the procedure required by law. They just don't do it adequately, and that's in our reply brief. Finally, with regard to this 1.5 million gallon recharge issue, they say in the environmental impact statement that we're not going to consider it. What they're doing now is they're discharging it. They say they're not going to consider it because? They say it's beyond their jurisdiction. What's that mean? I'm not really sure, Your Honor, but it's a cumulative direct and indirect impact. As I read NEPA, it doesn't say tell us what's going to happen with things that are under your control and within your jurisdiction. It says tell us what's going to happen. Well, that's exactly right, Your Honor, and the fact is that the Hopi at one point sent a letter to the city of Flagstaff asking about this, and the city responded saying, well, there's going to be a thorough NEPA process, and the Forest Service is going to look at all these issues you're raising. It's really not our problem. But the Forest Service is saying it's the city of Flagstaff water issue, but they say in the EIS we're not going to consider this. The lower court references Chapter 3H in the EIS and quotes some of the language. The language he quotes has nothing to do with this recharge issue. It has to do with the study area, which is actually up on top of the mountain. There are a couple of pages in 3H. One of the pages is where they say we're not going to consider this in our decision making. Then they follow that by a couple of pages. What's the concern regarding the recharge issue? What's the concern from your client's perspective? Well, from my client's perspective, the concern is right now they're using this water, 1.5 million gallons a day, and they discharge it into the Rio de Flag River in Flagstaff where it recharges the aquifer. So there would be less of a purification or dilution effect? Is that the thing? We're not saying that that's what they should be doing with the water, but northern Arizona has a severe water shortage problem, and they are putting this type of effluent to constructive use in many ways. We're not saying that they should be recharging the aquifer with it or not. What we're saying is by diverting that water from the aquifer and spraying it on the mountain, they're going to cause some serious impacts. What we're saying is they didn't follow the process required by law under NEPA to address those impacts. That's what you're saying. The idea, I think, is, just to make sure, I'm trying to move us along here, that if the water is sprayed on the mountain instead of simply discharged into the river, it will to some degree sublimate, that is to say move directly from the snow form, the ice form, the crystal ice form into the atmosphere, to some degree evaporate, to some degree percolate into the ground, but perhaps go into a different watershed, and you say that should be studied. Yes, Your Honor. In fact, it's even more simple. We don't have to come up with a substantive conclusion. We just have to say they didn't follow the process because NEPA is at its heart a procedural study. Okay. Thank you. We'll now turn to the other side, and we'll give you a short moment for rebuttal from each of the parties. May it please the Court, my name is William McFadden, and I represent the Forest Service. I'll be dividing my time evenly with counsel for the interveners. It's 2 into 25. It should be a 12-and-a-half-minute piece, I believe. We'll try to help keep you on the straight and narrow. Thank you, Your Honor. The Forest Service is charged with managing the public lands for multiple uses, and the Supreme Court recently recognized that that's a deceptively simple term. It describes an enormously complicated task of striking a balance between competing and often conflicting uses. And I want to emphasize that the decision to approve the upgrades to the Snow Bowl Ski Area were not taken lightly or in haste by the Forest Service. They were the result of several years of study of a number of contacts, almost 500 contacts with the tribes on this project specifically. That was done in consonant with the consultation done as part of the National Historic Preservation Act. There was a number of comprehensive environmental studies, both conducted by the Forest Service and conducted by others and reviewed by the Forest Service and used in the FEIS to reach its conclusion. Does the Forest Service have a financial stake in this dispute? No, Your Honor, it does not. Does it get any money in terms of fees per user? It does receive some amount in terms of percentage of royalties from the ski resort. And if you get more years at the resort, the Forest Service gets more money? That's true, Your Honor. Therefore, do you have a financial stake in this? Yes, Your Honor. Thank you. Now, are you familiar with Judge Noonan's dissents in two separate salvage logging cases in which he argues that the decisions of any agency that has a financial interest in the agency decision should be regarded with some suspicion? Yes, Your Honor, I'm familiar with those dissents. I'm not sure what to do with that, but I have to say I do find it troubling in the salvage logging cases and perhaps here as well that the Forest Service is not an entirely neutral decision maker because you do stand to have a financial gain if this project goes forward. I think at a level of 90 cents per additional skier. Your Honor, I have a couple of responses to that beyond the fact that Judge Noonan is still in dissent on that theory. The first is that the money, of course, is not returned immediately to the Forest Service and used by Forest Service employees. That money is to the Treasury of the United States. And secondly, we're talking about a small amount of money in comparison to both the overall amount of money that the operators of the resort may make and also in comparison to the type of money that the Forest Service might receive as a result of a salvage logging case. I think I got the number right out of the record. It's 90 cents per skier per day. That's correct, Your Honor. So I think that actually goes towards the context in which the agency has made its decision. The agency has had skiing in this area since 1937. It's only a brief respite in the 1960s. And it approved, after an extensive EIS in 1979, upgrades to that facility and expansion of the acreage in which it can be skied. The Forest Service has given an important role in the National Ski Permit Act, that's 16 U.S.C. 497B, in providing skiing as a specific form of developed outdoor recreation for the public on the public lands. And in furtherance of that, there are ski resorts on national forest land throughout the country. This is, of course, one of them. And this is the only area in the Coconino National Forest, an area of some 19 million acres in northern Arizona, where skiing is viable. Not only is there already a ski area here, but it's the only place that has necessary infrastructure and terrain to permit it. Why is there so little in the body of the report, and then actually not very much in the response to comments, on the possible impact on human health of using treated sewage for artificial snowmaking? Well, Your Honor, I disagree with that characterization. There's a great deal of Chapter 3H of the FEIS, which we excerpted heavily, which discusses this at length. And to answer specifically some of the comments made by the Privacy Council, if you look at SDR 766, there's specific discussion of studies conducted in South Africa, where municipal drinking water does use reclaimed water as its primary source. Studies conducted in Denver, where that was proposed and considered heavily, and studies in Orange and Los Angeles counties in California, where up to 38% of the drinking water- I read the FEIS. I didn't just read the excerpts, I read the FEIS. And I've got a sentence on page 3-199 of the FEIS prepared by the Forest Service. Quote, it is now known that most documented outbreaks of waterborne disease in the United States are caused by protozoan and viral pathogens in waters that have met coliform standards. And I've read your description of these studies. What is missing here is what contact the users will have with this water when transformed into artificial snow, what frequency, what quantity, and what consequence. I see nothing except, well, kids are going to be controlled by their parents, or maybe they won't even be controlled by their parents, but it's the responsibility of the parents whether they eat it or not. Well, Your Honor, the agency, as a precursor to addressing those specific concerns, looked at the state-of-the-art science, including not only the WHO study, but all of the available epidemiological information about ingestion of the reclaimed water, and that would necessarily constitute contact with it as well. A lot of that is at supplemental excerpts, page 778, where the concern about children is raised by one scientist who had done habitat and wildlife behavioral studies. I'm sorry, I've got the FEIS. Do you have the FEIS page? I'm sorry, Your Honor, I don't. It is page... It is page... Oh, I thought it said 3-199. The page you're looking at, I'm actually talking about... Well, I'm sorry, Your Honor, I've given you the wrong page. It's the page that cites Colburn and then his following study. Yeah, and what page are you on? I was... He discussed it, page 3-189, and there is further, through this chapter, discussion of his studies, where there is discussion about the possibility of... 3-189 is the best example of this, where he, based on wildlife studies, raises concern about a wide range of human health problems. Then the Forest Service study says that the linkage between animal studies and human health effects is controversial. Some raise whether these harms are even occurring in the first place. Those are not cursory statements by the Forest Service, but they are the result of a review of not just the WHO report, which compiled the world's epidemiological studies on this issue, but other reports as well. There simply isn't the linkage evidence available. There's some discussion by the Navajo, for instance, that there is only selected citations of Dr. Propper's report, for example, because she discusses possible effects on wildlife behavior of frogs, and the Forest Service relying on this information that there is no way to draw a correlation between possible effects on wildlife behavior and human health impacts. I read all this, and it's all very general. It's sort of like you're just summarizing all the studies, but what seems to me to be missing is any study as to the likelihood of actual users of the ski area coming in contact with it, either under their skin, ingesting it, how often is it going to happen, in what quantities is it going to happen, what possible consequences might happen. There's nothing, except that children's parents are supposed to tell them not to eat snow. Well, in terms of contact, there is some discussion, and again, I apologize. There's some talk about contact, but there's nothing that I can see that tells me how likely it is to have contact, how much contact there is. We're told that there will be signs that will say this is reclaimed water. Don't eat it. That's right. There will be signs. Now, how many signs? That's not specified in the plan. How big are the letters going to be? The signage is the result of requirements of Arizona Department of Environmental Quality Regulation. Have you put that into the FAIS, how many signs there are going to be, where they're going to be, how big the letters are going to be? I know, Your Honor, that information is not in the FEI. And have you done any study as to whether or not 100 people drawn at random out of a skiing or using population understand the term reclaimed water to mean treated sewage? I'm not aware if the state of Arizona has done such a study. Have you done such a study? The Forest Service did not conduct such a study. So, in other words, we don't know. We do not know, no. And the reason that the Forest Service, nevertheless, found this was a reasonable project is because the science available to it and the science that it conducted, it also conducted an enormous amount of science on the actual wastewater coming from the Rio de Flag Water Reclamation Facility and studied in great detail what solutes might be contained in the water after treatment and what those effects might be. So I don't want it to make it sound that because that study was not done, the Forest Service turned a blind eye to a potential harm. The Forest Service's studies did not alert it to any potential harm. There's concern raised by the appellant that there wasn't enough study done, but they haven't pointed any evidence that suggests there is harm that will happen that the Forest Service has ignored. Well, you know, but there's a problem here. The signs say, and Arizona law requires that the signs say, this is not potable. Don't ingest it. From which I think we may presume that the state of Arizona has decided that this is bad for you. We may presume that, yes. But there's nothing in here that tells me how likely it is that children or other users of the ski area will, in fact, ingest the snow. There's not, Your Honor, because the information we had about the potential harm that could come from ingestion suggests that there's no likelihood of harm and there's no indication of potential human health impact. The problem I have with that analogy is that it depends on how the reclaimed water is being used. You know, some of the uses that are described are for watering playgrounds and things of that nature, which don't inherently contain a risk of ingestion. I know there was some suggestion that children might eat the grass, but I think that's pretty far-fetched. It's not nearly as far-fetched that a child would eat snow. I mean, children do that just worldwide probably. So I think that it's difficult for us to be persuaded when the context is a little different on the studies for presently used treated wastewater. Well, Your Honor, the studies I'm talking about are talking about the use of treated wastewater as drinking water, which would presumably be even more ingestion than eating snow. Additionally, reclaimed water isn't just used on children's playgrounds that they might eat the grass. It's also sprayed on vineyards and used to irrigate crops. That's a different process because then you have the process of the plants and the soil breaking down the water comes back in a different form. So that's a little different than using it for snow. This snow is also different in that the freezing process helps reduce the likelihood of the contaminants. And additionally- Wait a minute. Is that in the EIA? Yes, Your Honor. There is some discussion about that. Where is that? That record site. I'm sorry. I don't have it. Are you thinking of page 242 of Volume 2? Yes, Your Honor. That does reference the test that was- Here it is. It's 22.8. The question or comment was, I think Snowbowl needs to use reclaimed water to make some snow on a field or hillside for a couple of reasons, blah, blah, blah. Answer, in the fall of 2002, the Snowbowl arranged an airless snowmaking gun demonstration at the Rio de Flag treatment facility. A large mound of snow was successfully produced. The quality of snow was consistent with what one would expect of snow made from potable water. Interestingly, water quality samples taken prior to the snowmaking process and similar samples taken of the machine-produced snow revealed that the overall water quality improved slightly as a function of the freezing process. What does that mean? That is consistent with the studies discussed in some part of Chapter 3, which unfortunately I don't have the page number for. I'd be happy to provide it for you after argument. I saw nothing in there that told me that freezing sewage effluent reduces the contaminants. There are references to, in the administrative record, Part 89 is a large collection of scientific studies, some of which address this issue. Which say that freezing the effluent reduces the contaminants? Yes, Your Honor. That's my understanding. Whenever someone says that's my understanding, that means they're not sure. That's right. That was my understanding. You seem quite convinced that it's not true. I'd like to go into the references and let you look at them. I understand that freezing will reduce the quantity of contaminant in the matter that's frozen. Which is why I would like the opportunity to provide you with specific references. Not to mention the fact that it's all about. Right. Well, the other thing that happens is that the artificial snow made from treated water will be used at the beginning of the season as a base covered by natural snowfall. If you have natural snowfall. That's right, if you have natural snowfall. As I recall, in the not-too-recent past, there was a disastrous snow season in which I think the total inches that fell during the entire season was something around 50 inches. That's right, Your Honor. If you get another season like that, my guess is you're going to end up with a base of 200 to 250 inches. All except 50 inches will be artificial snow made with A-plus reclaimed water from Flagstaff. That is possible. However, it's not probable. If you look at the other years, there have been some years of very good snowfall, which of course would serve to dilute it. Right. I'm unfortunately out of time. Let me just ask you one question. Certainly. Is it true that if approved, this would be the first ski resort that snow is made totally from treated wastewater? That's correct, Your Honor. There are other ski resorts that use partially ... Right. Part of their snowmaking is done with reclaimed water. This would be the first that is exclusively. You said part of their snowmaking is done with reclaimed water, or do you mean their snowmaking is made with water that is partially reclaimed and partially pure? The latter, Your Honor. May it please the Court, my name is Janice Schneider. I represent the Arizona Snow Bowl Resort Limited Partnership in this matter. We are the permit holder for the Snow Bowl special use permit, the 40-year permit. To answer your question, Your Honor, there is a text in the FEIS about tests showing that the act of freezing purifies water even more. I point the Court to SCRSR supplemental excerpts of record 793. Do you have a citation to the FEIS? That would be 3-204. Okay, I'm on 3-204. If you look at the second paragraph, Your Honor, according to studies conducted by the U.S. Army Corps of Engineers, the process of freezing and repeated freeze-thaw cycles also destroy bacteria in reclaimed water. The results indicated that more than 99.9% of the total coliform bacteria and more than 99% of fecal coliform bacteria were removed in the snow melt from non-chlorinated secondary wastewater supply used. That's just from the process of freezing. So what we have here is a tertiary, which is the highest level of treatment available. It's state-of-the-art. There's UV disinfection. There's the process of freezing, which further cleans it. And this particular facility also disinfects through chlorination. There's a residual of chlorination in the water to ensure that the water is not going to have those kinds of microbial impurities in it when it is used, and it is used quite extensively throughout Flagstaff. Eight hundred million gallons of this water is in the environment annually, every year, all over the city of Flagstaff. The use of reclaimed water is a major, major issue in the desert southwest. Did I ask you a question about your statement regarding the freezing? What happens when it thaws, if it's frozen and the bacteria is killed? Well, the bacteria is killed, so it won't spring back to life. And then what happens with the actual water when it thaws is because of the geology of the area, which is a very porous volcanic area. It's a high desert area. The studies in the FEIS and evaluations show that the water will infiltrate very, very quickly into the ground. Okay, this talks about coliform bacteria and fecal bacteria. Aren't there other bacteria that we need to be concerned about? Those are not the only two bacteria that would be in the water. So what about the other bacteria? That's correct, Your Honor. I mean, what the studies have shown, and the city of Flagstaff, because the water is used so extensively on children's playgrounds, churchyards, crops, et cetera, because it's used so extensively, the city of Flagstaff, it's a highly regulated industry. The city of Flagstaff has three different permits. They're allowed to discharge this water to surface waters. The water, they've done specific testing. Of this specific water, it meets all state surface water and federal drinking water standards. And whether we like it or not, our drinking water contains a lot of the stuff that is included in this water. If it meets those standards, why does the Arizona Department of Environmental Quality require signs to be posted saying do not ingest this water? Well, I think there's a recognition that there is uncertainty in the science. There's no question about that. But I think primarily it's a public perception issue. As counsel indicated, direct potable reuse of water is done in South Africa. They are looking at doing it in other places across the United States now, certainly in arid areas like here in California. You know, people are drinking large percentages of reclaimed water today, and they have been for over 30 years with no adverse health effects. Now, wait a minute. Excuse me. When you say people in California are drinking, you said large percentages of reclaimed water? In L.A. and Orange Counties, they have what they call indirect potable recharge. So they put the water into the groundwater, and then it's used for drinking water. And of the tests that they've shown- So that is to say you're saying that the reclaimed water after treatment is put into the ground. That's correct. And after percolating into the aquifer, water from the aquifer is used. That's correct. That's a little different. Well, it is different. It is different. But- It doesn't sound like it's putting it on the surface, and then the kids might just put it in their mouth. Well, but again, you know, there are additional treatments that are going on here as well. Additional treatments, namely? The chlorination and the freezing, you know, the process of the freezing, which destroys the bacteria. Your Honor, I'd also like to address your presumption, which I respectfully disagree with, that because Arizona has said you can't drink the water, that it assumes that it's bad for you. The state of California has extensive reclaimed water use. They also have approved snowmaking, the use of reclaimed water for snowmaking here in this state. And have they approved it when the snowmaking is entirely using water that is reclaimed? Yes. Where? I don't know that they're actually using it, but it is an approved use from a regulatory- Where is that stated in the record in front of us? I can give you the regulatory site, Your Honor. The regulatory site for its approval in California for snowmaking is 22 California Code of Regulations, Section 60307. I'm sorry, say that one more time? 22 CCR 60307. Both the state of California and Arizona Department of Environmental Quality are charged with the protection of the health and safety of the citizens in their state. They have evaluated the use of reclaimed water for a wide variety of uses. Both states have concluded that it is appropriate for it to be used for snowmaking. And I think that, you know, that assumption- I'm aware of, and it's in the record, that there are ski areas around the country that use water that is partially reclaimed water. Correct. But I think it's in the record of this case that we're unaware, the witnesses here, unaware of any ski area that uses for its snowmaking, I'll call it this, purely reclaimed water. Yes. I mean, one has been recently approved in Australia, Your Honor, at Mount Holcomb. They're going to be using 90% reclaimed water. It's expected to go online either 2007 or 2008. Do we know in the Australian case what their definition is of reclaimed water, that's to say the levels of treatment? Because I see right here in the record the sort of treatment that's done. If you were to do an osmosis reclaimed water, that's pure water. I mean, there are various kinds of reclaimed water. That's correct. I do not have those facts in front of me, but I can certainly provide them. Well, the question isn't whether they're in front of me or you. The question is whether they're in the record in front of the FBI. Admittedly, this is a decision that was made post EIS, but given the questions that and some of the presumptions that I sense that the court is making, I want to point out that. I have trouble resisting the assumption that it's bad for you when the state of Arizona says don't drink it. Well, again, I think that goes to the lack of public acceptability with respect to that issue. And the admitted uncertainty in some of the signs. Now, I'd like to go back to what the Robertson, the Supreme Court's Robertson case says about NEPA analysis. And that is that the agency doesn't have to choose the most environmentally sound determination. All they've got to do is evaluate the various issues, which this agency did, identify the uncertainties. Okay, counsel. I'm not sure that there was an evaluation of all the alternatives, especially the snowmaking ones, the possible repercussions of ingestion, of the snow being absorbed into the skin. I mean, what's discussed? Well, the dermal contact is discussed in the response to comments, Your Honor, at SCR 1006. And I think it's fair to say that the Forest Service evaluated all of the available science on this issue. They looked at the pros. They looked at the cons. They fully disclosed those issues to the public. But it was, as I mentioned, as your co-counsel was up, what I see missing is application of the science to an actual ski area setting so that we have some understanding as to how much contact we're actually going to get, how much ingestion of snow by children we're actually going to get. That's just not here. Well, and I think that's difficult to evaluate. I mean, there are a lot of variables there. It depends on the number of people that come. In terms of how many signs are going to be there, Your Honor, there's going to be 82 signs. They're going to be all over the place. How does it say there are 82 signs? It's not in the record, Your Honor. Okay. But they are my client, and that's what they're planning on doing. And does it say reclaimed water? It does say reclaimed water. And there's interesting notation in the record that reclaimed water is chosen as a term because it's a, how do I say it, it's a more acceptable term. Do you have any studies at all that tell you what people understand by the term reclaimed water? I think the people of Arizona, which is an extraordinarily arid state, all understand what is meant by the term reclaimed water. Do you have any evidence for that other than your statement? Do you think that that is so? I do not, Your Honor, but it is prevalent, and certainly within the Flagstaff community it is well known, and I think that's a reasonable assumption that the court can understand and accept. Well, I'm afraid I'm unwilling to make that assumption without somebody telling me that it is commonly understood that reclaimed water is treated sewage. If treated sewage and claimed water were synonymous, I'd be a little, I'm not sure I would find the emphasis in the record of make sure you use the term reclaimed water because that's going to be the better term to use. The language of the signs is going to be as required by state law. I mean, the regulations specifically use those terms. These signs are all over the city of Flagstaff. Everybody there knows what these signs, I mean, they know what reclaimed water is. They live with it. They've been living with it for 15 years. Will all the skiers come from Flagstaff? Most of the skiers, yes, Your Honor, most of the skiers come from Phoenix and Flagstaff. This is not, you know, a destination resort like Aspen. It's, you know. Can you tell me, and this may be irrelevant, but I was interested, did the parties have any share in doing preliminary draftings of the findings of facts and conclusions of law on the referral part of the judge's opinion? The judge asked all parties to submit proposed findings of facts and conclusions of law. And whose draft is here in the judge's opinion? It's a mix of the various drafts. My experience is that the winning party submits the draft and the other side objects. Right. There were no objections dodged. It was not my draft. In large part, my sense is that it's the federal draft. Your sense is? That it's the federal draft. Were you participating in the litigation at that point? Yes, I was, Your Honor. And it's only your sense? You don't know? Well, as I said, Your Honor, I mean, it's not, I don't believe it's a verbatim of the federal. I think it's based in large part on the federal draft, and the court did make some adjustments to that. But, you know, I haven't gone through it line by line to be able to tell you where that is. Okay. But the draft originates with the parties. That's correct, Your Honor. Okay. And, you know, I just want to say one other thing about the RFRA point. On the RFRA claim, I mean, the test, I mean, what we have here is a perception issue, and that the use of reclaimed water is bad spiritually. But the legal test is the pre-Smith test. Those are the tests that should be used here. And the question there is whether the government is taking some outward action to prevent, deny, or coerce a party into not exercising their religion. I'm sorry for taking you over, and I apologize, but we've spent so much time on RFRA with the other side and so much time on NEPA with you, it's a little unbalanced. Would it be a substantial burden within the meaning of RFRA if the government were to require that, in the state of Arizona, that baptismal fonts contain recycled water? I don't think it would be. I mean, I think this water is fine. I'm not asking you whether you think this water is fine. I'm asking whether the Catholic Church would consider it a substantial burden on their exercise of their religion if the state required that water used in the baptismal font was reclaimed water, forbidding them to use pure water. I'm not Catholic, and I don't know the answer to that question, Your Honor, and I'm not going to hazard a guess on it. I think what we have to focus on here and what the court needs to focus on here is the substantial part of the substantial burden test. The snowball is on 1% of the entire 74,000-acre mountain. Snowmaking is going to occur on one quarter of 1% of that permit area. But, Counselor, if you accept the opponent's representation that the mountain is viewed as a whole, which you have to because we cannot question the sincerity of religious belief, then does it matter that it's only a fraction of the mountain if the entire mountain is desecrated by that use? Well, I think it does. Just like in the Garou case, I think context does matter in terms of what constitutes substantiality. And so, you know, what the appellants are proposing here is a test that, let's say, for example, the National Park Service has a historic church, and they decide to do something in the historic church that the petitioner, you know, the practitioner, rather, believes diminishes the sanctity of that church. That's the exact same sort of thing. Under their, in the mind of the beholder, sort of a formulation of what substantial burden should be, every government action becomes subject to a potential RIFRA challenge because anyone can say, that offends my gods, that offends my deities, or, you know, I have a religious objection to that government program, this government program. Obviously, the impact on federal land management where millions and millions of acres, major U.S. facilities are considered to be sacred, the Colorado River, Mount Graham, the Grand Canyon, you know, in the southwest alone of the Forest Service Region 2, there are 40 to 50 sacred sites, sacred mountains. What about opposing counsel's count argument that the Forest Service concedes that it can still carry out its multi-use responsibility if this project were denied? Well, I think that's kind of a red herring because the reality is maintaining the status quo doesn't further the government's compelling interest in maintaining the viability of this existing facility. This facility has been there for 70 years, and I think the government has a compelling interest in that. The evidence that qualifies... Why is that the government's compelling interest? Businesses go out of business, you know, all the time. I'm not convinced that this ski area will, but assuming for the moment that the consequence of not allowing this to go forward will result in what your client occasionally says will result in the closing of the ski area. I'm not convinced that that's so, but assuming that that's so, I mean, the United States government allows businesses to go out of business constantly. Right. I mean, this is a unique parcel, you know, in Arizona. It's one of only two major ski areas in Arizona. The other, by the way, the competitor, by the way, is run by the appellant White Mountain Apache tribe. So, you know, this is a unique parcel of the government's public land. The public derives public benefits from it. It's a designated public recreational site. And the government, in the record, has determined that itself, without the Snow Bowl being there and the business owner being there, it cannot run this facility alone. And that is in the record. And so the government has decided it wants to keep this longstanding important facility that employs 450 people when there is snow that pumps $9 million into the local community. Do we have anything in the record that there's an economic analysis that the business will shut down if not allowed to go forward with this project? I know we have statements from the business that that's so. Yes, Your Honor. Do we have an economic analysis that that is so? Yes, Your Honor. It is in the record on that page for you. If Your Honors look to see where it starts, you know, underneath there's typically an environmental analysis conducted. And this analysis generally starts at SER 698. Do you have an SER? Yes, I'm sorry, Your Honor. It's page 3-80. 3-80, okay. And it goes on to talk about in the following pages, you know, it talks about there's a strong demand for skiing. No, I've got a more specific question, and that is, is there an economic analysis that leads to the conclusion in the FIS that says if this project does not go forward, this company will quit the business and the ski area will cease to operate? Yes, Your Honor. Let me find that page for you. It's also in the record of decision based on the analysis that is in the EIS. You may be interested in 3-83, bullet point 3. Is that where you're after? That's about where I am, 3-83. 3-83. Yes, that's part of the analysis. All right, under the circumstances, continuation of the current operation may not be sustainable. Yeah, the word is may, yeah. That's true. That's true. But, you know, the evidence, the evidence due to trial is very clear. We've submitted additional evidence for the record under seal with respect to Snowbull's finances. I mean, the business is in a deficit situation over the last 11 years. No, I've seen the numbers. Right. I mean, when you're open for four days and you have fixed costs of $3 million, then that's just simple economics, Your Honor. Okay. No further questions? We apologize for holding you over. I appreciate the opportunity, Your Honor. I apologize for going so slowly. We took the government 10 minutes over. You went a little over the first time. Let's start out with each side, each party gets an additional two minutes. Okay, appreciate that, Your Honor. Well, most of your questions went to NEPA, and I'm focused on RFRA, so I'll just have a few short comments. First of all, I want to emphasize here, this is just not a matter simply of religious belief. It's an impact directly on religious practice. And I can give you yet another example. Our clients, the Wallapai, use a spring that is slightly to the west and further down the slope from the ski area. They take the water from that spring. That's the water of life. They use it for many types of ceremonies. One particular ceremony is a healing ceremony for problems with the head, spiritual healing ceremony. This is the only place this water can come from. If the effluent is put on the mountain, even the hydrologists who say, well, we think the water is going here, we think the water is going there, can't say for sure where the water is going. They can't say that it won't get into those springs. And from the standpoint of the Wallapai, if they use that water and there's any of that water in there, they're committing spiritual malpractice. That's the testimony, that the person could be affirmatively harmed by the use of that water in the healing ceremony. So those are the kinds of impacts we're looking at, very direct impacts on practice. It's not just a matter of belief. And I thought the question that was asked about the baptismal water, or the example that Ms. Schneider gave, if you were dumping recycled water in the corner of a church that's on the National Park Service land, and said, well, but that's okay, you can still use the pulpit, you can use most of the pews, not all of them, but most of them, of course that would be a substantial burden. And the same thing is true here. The other thing I'd like to say about compelling interest, and I think your Honor is quite right to be skeptical about the future of this, whether this ski area would continue. The Forest Service itself has said the ski area is not going away. In the FEIS, an alternative three, which doesn't involve snowmaking, there's no suggestion that that would cause the ski area to close. In fact, they say some of those improvements would be made. And the last point I would make is, Snowbowl was ready to go forward with this without snowmaking, based on the 1979 EIS, based on the approval of that, because most of the items, and the court so found, were already included in that. They were ready to go forward with that until they found out they had to do another EIS. And it was at that point they said, well, if we have to do another EIS, we might as well go for snowmaking.  I'm sorry. Thank you. Thank you. Scott Kennedy again for the Hopi tribe. Just two quick points. Ms. Schneider, it's certainly correct that context does matter when you're considering compelling interest. We're, however, not talking about the thousands or hundreds of other sites that the Hopis consider to figure in some way into their religion. We're talking about the central site in their entire religion, the San Francisco Peaks. This is a unique parcel. Ms. Schneider points out that it's been operating as a ski resort for 70 years. The Hopi were visiting this site when the Magna Carta was signed in 1215. The Hopi were visiting and revering this site when the United States fought the Revolutionary War, when the Constitution was signed. When you weigh those two, which one is the more unique interest here? Thank you. Thank you. Thank you, Your Honors. I'd first like to point out that you really did ask Ms. Schneider the right questions, but let me give you some very brief different answers. The freezing of the water may impact coliform and fecal coliform. The problem with this water is that it's got what are referred to as personal care products and pharmaceuticals. People take drugs and they pee them out or they flush them in the toilet. There are things in this water that are not in drinking water because of the source of the water. When she says they meet drinking water standards, what they're testing for are the things that they generally anticipate finding in drinking water, not what they anticipate finding in reclaimed sewer water. Now, the other point was the reference to 100% treated wastewater. What does that mean? I'm from Arizona. It took me about three or four days of trial to figure out that when they talked about treated wastewater, they were also including things like stormwater runoff, which would not have the same types of issues. Finally, please keep in mind that what we're talking about here is a non-destination ski resort located in a part of Arizona that no longer gets sufficient snow to support skiing. It's on federal land that's environmentally sensitive and valuable, and as the federal government acknowledges, it's sacred to 13 of the tribes in the southwestern United States. To the Navajo, they see it as their mother. It's important to the Blessing Way ceremony. It's part of their body. To the Havasupai, it's part of the creation story. To the Apache, that's where the Gaam live, their deity. This is an important site, and when you're doing the RIF rebalancing, keep in mind that we're talking about a non-destination ski area on federal land. Someplace they don't get snow. As the federal government pointed out, and I'll step down, and this is a quote from the EIS, snowmaking and expansion of facilities, especially the use of reclaimed water, would contaminate the natural resources needed to perform required ceremonies that have been and continue to be the basis for the cultural identity for many of these tribes. So what we're talking about here, according to the federal government, this project is going to contaminate the resources needed to perform required ceremonies that form the basis of the tribe's cultural identity. What more could somebody show to establish a substantial burden under RFRA? Thank you. Okay, thank you, both sides. Thank the council for both sides for well-presented and effective arguments on both sides. The case is now submitted for decision, and we are in adjournment until tomorrow morning. Thank you.
judges: W. Fletcher, Rawlinson, Henderson